At this time, we'll hear Centro De La Comunidad Hispana versus the town of Oyster Bay. Good morning, your honors. My name is Jonathan Sinerike. I'm counsel for the appellants, and to my left is my colleague on the brief, Mr. Timothy Hill. I'd like to use my time this morning, your honors, to address three principal areas where I believe the record, and we have quite an extensive record at this point in this case, clearly shows that the district court committed reversible error in granting summary judgment in this matter. And those three areas are the issues of standing, the improper interpretation of the first prong of the central Hudson test for the regulation of commercial speech, and what we contend was a very fundamental and egregious denial of due process to my client, especially in connection with the granting of a protective order, which effectively prevented us from actually obtaining any testimony from the primary witnesses in this case, namely the day laborers whose activities are, of course, central to and at the heart of this case. So to begin with standing, and not to mince words, we believe the record shows that the claims of the two organizationals to standing is a sham, a complete and utter sham. They have no standing. And of course, this court addresses that issue de novo. Let me begin with the primary plaintiff, Centro. The record shows that that organization didn't exist at the time the ordinance was created. In fact, it was created for the sole purpose of bringing this action. This action is its sole raison d'etre. It's not even, we contend, before we even get to the standing issue. Well, I think they say that it's their major reason for existing, but they do not have any evidence of other counseling, etc., etc. What they may say that, Your Honor, I don't think if you read all of their testimony, they say incredibly what the record shows is that there is a long existing, not-for-profit organization that very ably represents the interests of the Latino community in Oyster Bay. They refuse to bring this action that's in the record. And after they created what she contends to be this entity, we don't even concede it's an entity that has capacity to act and bring an action in court. The testimony there is that this... What are the essentials of an organization? What do a group of people have to do to become an organization? At the very least, Your Honor, there has to be a membership. And here is Ms. Torrey's testimony in her deposition. It's at the record at page 231. I asked her the question. She had testified that anybody who attends a meeting is a member. So I said to her, so there's a list of people who attend the meetings. Are those people, by definition, members of Centro? Is that correct? Answer, we don't have membership. I then asked her, you said you become a member by showing up at a meeting. Is that correct? Yes. Once you're a member, do you stay a member forever, even if you don't attend a single other meeting? Answer, I don't know. So even at the most fundamental level, you can't define who is a member of this organization. It has no charter, no bylaws, no bank account, no employees. It has no indicia of being anything but an ad hoc group of people who, for very good reason, perhaps are disturbed by this ordinance. So that's kind of the capacity issue before you even get. Isn't that just another way of arguing standing? I think capacity and standing are really separate. I think before you get to standing, there has to be an entity that exists in reality and not simply in the mind of one person, which we contend, quite frankly, is the really the same. But let's get to standing. They claim two kinds of standing, okay? I'm still on central. One is injury to the organization itself, and the second is diversion of resources. With respect to injury to the organization, again, the deposition testimony of Ms. Torres is very clear that the entity had suffered zero actual injury. I asked her, this is at 309 of the record, has the town of Oyster Bay done anything to interfere with CENTRA's ability to make those communications to the day laborers, to go to corners and inform them of these various things, et cetera? No. But my understanding, perhaps based on other aspects of the record, is that CENTRA is saying that they would be chilled or unable to meet day laborers in situ because they would fear being rounded up by the police in a sweep of people who are gathered in a park or adjacent to a park for the purpose of seeking employment. I would say two things about that judge. First of all, when she was specifically asked again at her deposition whether there were any specific acts of advocacy that CENTRA itself, the organization, planned to participate in that it was prevented to do so by the adoption of the ordinance, the answer was no. And with respect to the second point that I believe . . . So what is the organization? I mean, you're reading pieces of the record, which is perfectly appropriate. And maybe I should ask the other side, but what is the organizational injury and damage that they are claiming? They offer hearsay testimony, entirely hearsay, and I can refer the court to it, I have it sitting here, that the testimony is like this in the affidavits that they rely on. Ms. Torrey says, I have been informed by day laborers that they fear deportation if, you know, we engage in this advocacy. I have been informed by day laborers that they fear harassment. That doesn't deal with organizational injury. The only testimony, the only evidence in the record, Judge, is Ms. Torrey's statement herself that she fears it. That is the total substance of the . . . She does say that she fears that she'll be . . . when she is counseling or organizing, whatever it is, day laborers in this location, that she will be arrested by the police who are over-interpreting the statute. She does say that, even though she also testifies, as I just read you, that it's never actually happened, and she can't point to any planned actual acts of advocacy that would be . . . The ordinance never went into effect. It was enjoined, right? So there wouldn't be . . . She wouldn't be . . . She wouldn't have suffered past injury. It's her . . . She feels that she won't be able to do her meeting with the laborers if it goes into effect. Actually, Judge, I think it was in effect. It was in effect for about six months, I believe, before the TRO was entered. So there was plenty of time for that to happen. It didn't happen. She admits it didn't happen. In effect, but not enforced, right? Because . . . Well, the . . . Haven't they decided not to enforce it? The town made a decision internally. It wasn't, like, announced to the public, where it were not. The town made an internal decision, but the people on the street wouldn't know that. It went into effect. It was in effect for six months. There's . . . Well, she made a decision not to enforce it, so why, during that period, would she have suffered this being swept up if it wasn't enforced? But the fear . . . I don't believe they did any advocacy. Frankly, I don't believe this so-called entity . . . I don't believe there's really anything in the record that they actually do advocacy. There's really . . . It is all a self-serving statement of one witness who created this so-called organization. There's nothing in the record that indicates that they ever . . . Do you deny that Workplace exists? Yes, absolutely, Judge. Different situation. I'm happy to get there. Yeah, Workplace is a real organization. It really exists. There's no question about that. However, Workplace's testimony is that it could not testify to ever having had any presence in Oyster Bay at all prior to the ordinance. They never did anything in the town . . . In the town of Hempstead? Is that it? Yes, Judge. They exist, apparently, primarily . . . We're New York City people. How far is Hempstead from Oyster Bay? It adjoins it on the southern part. On the western side, Oyster Bay adjoins the city of Glen Cove in the north and the town of Hempstead. Do they continue? Yes, Judge. They're continuous, but they are not overlapping. The town of Hempstead is very large. It is very large. I was sort of wondering whether it doesn't include Oyster Bay. No. Oyster Bay is one of the only two towns on Long Island, but a trivia that runs from the Sound to the Atlantic. To its west is the city of Glen Cove on the Sound. The west is North Hempstead and Hempstead. These are separate entities? Totally separate municipal corporations. So, number one, in answer to your question, Judge, again, the testimony is that the Workplace never functioned in Oyster Bay at all. Secondly, with respect . . . Before the ordinance? Before the ordinance, correct, Judge. They had no presence. They didn't engage in advocacy in Oyster Bay. With respect to the diversion of resources, here's the sole testimony in the record that supports that claim. What page are you at? I'm at page 956 of the record, Your Honor, the deposition of Nadja Maron. I know that the organization, because of what was happening with respect to the ordinance, had to put some time into finding out about the ordinance as it was being passed. I would claim, Your Honor, that that de minimis effort to find out about the ordinance hardly is the kind of effort that, for example, in the Bodongo case that was the Ninth Circuit, you know, threw out the ordinance in that case on bunk, and we'll get to that, I'm sure. There, the organizations were actively involved in representing day laborers with respect to tickets, going down to City Hall, doing things. So, the bottom line, Your Honor, is we don't think there's anything in the record other than the mere self-serving affidavit statements that they fear the impact. No, that gives them standing. If that's enough for standing, anybody has standing. Anybody can make those statements, I fear, an impact. I thought workplace indicated that they were, because of the ordinance, they were moving in to the counseling business in Oyster Bay. Judge, I'm not aware of that testimony. The testimony I'm aware of, they were never in the counseling business in Oyster Bay to begin with. Or the ordinance they weren't. Right. Okay. So, after the ordinance, they diverted time to finding out about it. Yes. Okay. So, and that was for no purpose? I thought they were also asserting injury to the organization because they wanted to be on the street corner now counseling people because of this ordinance. I thought it was similar to Centro's argument, but maybe I'm wrong. No, I think there is a statement to that effect, correct. So, think about it. So, before the ordinance, they had no interest. They were never there. Once there's an ordinance to challenge- They were never in the town at all. Correct. Once there's an ordinance to challenge, all of a sudden, there are these hypothetical interests that have never actually- Do they claim that they were actually active there at any time in the six months in which after the statute had been passed and not been enforced? I think the testimony was that they sent people there to find out what was going on. Yes. You started out saying that you had a due process challenge to the protective order. The protective order prevented you from finding out the names of the membership of Centro, but you're also arguing that under our decision in our bio that that wouldn't be a basis for standing anyway. So, it can't be a denial of due process not to tell you the names of the people who are being represented when the organization, as you claim, lacks organizational standing,  Well, I don't completely agree with that. Let me tell you, I don't completely agree with Your Honor on that, but I want to point something else out. I'll start with the latter. The real injury, the real due process injury that was done to us by that protective order, which, by the way, the magistrate judge's decision herself admitted there was- The threshold requirement wasn't met, but put that aside for a second. We wanted to depose day laborers. We wanted to ask them the questions, for example, do you consider yourself a member of any of these organizations? What you really wanted to do was document your claim that all of these people were criminals and this was a criminal enterprise. We were born at night, but we weren't born last night. Your Honor, we make no bones about it. Of course we wanted to ask them and the employers both about the facts of what went on. This court, when we were last here, this court, Your Honor, was on that panel, of course. The decision of this court, and I have it here, says that its problem was I raised these issues hypothetically, there was no record, and it basically said, go back and make a record to determine preliminarily whether and to what degree the barred speech is related to illegal activity. That's what this court, Your Honor, told me to do. How are we going to do that? The obvious way you do that, in any case, is to depose the witnesses. We weren't allowed to depose the key witnesses. Yes, Judge, of course we wanted to ask that question. We also wanted to ask, are you a member of Centro? Do you even know that you're supposedly a member of Centro? And yes, we wanted to ask about the content of the speech. You knew that no one would test you. I did not know that, Your Honor. Well, if you were their lawyer, you would not permit them to test you. I don't, I haven't, honestly, I haven't thought about that question. Very unfair hypothetical. I don't, you know, Judge, that's a really good and interesting question. I don't know what I I have never had a case where the primary witnesses were kept out of the cases as witnesses. How do you, how do you, how do I do what the court told me to do, which is go and make a record and not be able to, excuse me, primary witnesses are the ones you have, the ones who testify about the injury to Oyster Bay. Those are your primary witnesses, right? Your Honor, that's what, that's what's relevant to your claim. Your Honor, respectfully, I don't agree with this because, here's the record we were faced with in the case. I am reading from the declaration of Loz Torres. For example, day laborers, including members of Centro, have long complained to me about harassment and intimidation by neighbors. I don't want a hearsay statement by Ms. Torres, with due respect. I want to know if that's true. She says... But why does that have to do with the rationale for the ordinance, which is... Because... Injury to Oyster Bay, right? And it's citizens. That's the rationale for the ordinance. And you had people talk about the problems with traffic, et cetera, et cetera. Yes, without an overwhelming record of that. Correct, but we don't have. And what we were prevented from getting is exactly what this court, in what I just read you, told us to go get, which is whether or not, and the degree of the barred speech is related to illegal activity. Only the day laborers could tell us, are they here, are they legally able to work? Do they pay taxes? Are they given tax records? Are they covered by health insurance? What is the content of the speech that we're being told is being barred? We don't even have that. We're dealing with a total hypothetical. I think I understand what you're saying, but I'm not sure I know why the fact that the conduct may be legal or illegal bears upon the reasonableness of the regulation. Well, I think that's the most important legal question before this court today, of course. And it goes to the question, which I think is the key legal question, of the proper interpretation of the first prong of Central Hudson, which itself is an interpretation of the Pittsburgh press case. That's where it came from. And it's clear, Your Honor, I suggest that Judge Hurley's interpretation of that prong is incorrect. And here's what Judge Hurley says. He says that the first prong, which says that speech which relates to unlawful activity or is misleading, but we're dealing with the relates to unlawful activity prong, is entitled to zero protection. I'm sorry. I asked you a question, but I now understand the answer. So, thank you. Well, I wanted to get to that point anyway, Judge. I'm a little lost. Read that well, your interpretation of that prong of the Central. I've reserved two minutes, and I appreciate the court's attention. Good afternoon, Your Honor. Good afternoon, Your Honors. My name is Alan Levine. I represent the plaintiff organizations, both of which have as their central mission advancing the interests of day laborers. My adversary focused on important issues such as standing and due process. But first, it's important to understand what this ordinance is about and why all his record concerns are not central to the resolution of this case, nor was it central to Judge Hurley, though there was a remand for fact-finding. In fact, this is an ordinance that has nothing to do with facts. But that's the law of the case. There was a remand for fact-finding. I understand. And there is a clear implication that the results of those findings would have bearing upon the outcome of the case. And the facts that counsel wishes to have introduced were, in fact, accepted as true for the purposes of Judge Hurley's disposition of the summary judgment motion. That is, these are facts about illegal activities, nonpayment of taxes, workman's compensation. He assumed all of that to be true. He assumed it was commercial speech, nevertheless. He assumed he decided the case on the assumption that the speech being regulated here was commercial speech. That's exactly right. Even though he also assumed that it was illegal? No, he didn't. You just said that. No, he assumed there are two different issues of illegality. One about which counsel was talking now, I believe, relates to whether or not the workers themselves were permitted to work because perhaps they were undocumented workers. The second issue of illegality as to which the record is full is whether or not there were activities going on on the streets that either there was blocking of traffic or those people who were hiring day laborers weren't paying taxes. Whether or not workman's compensation laws were not being complied with. My understanding is the legality-illegality question has to do with whether the speech that is the center of this case, soon standing, is a protected commercial speech. If it is a proposal for an illegal contract to work off the books, violate the Fair Labor Standards Act, and violate the tax laws, that would not be protected commercial speech. And you said that the judge assumed all of that. And I misspoke because there are two issues of illegality. He certainly did not assume that the speech was unlawful. He addressed the first prong of Central Hudson directly and said there is nothing unlawful about the solicitation of employment by anybody. If it turned out that they were undocumented workers, there is still nothing unlawful about the solicitation of employment. That's not the issue. The question is whether the work that was being solicited, whether the person was a documented or undocumented citizen or whatever, whether that transaction was a legal transaction because it was anticipated that it would violate the Fair Labor Standards Act, the tax laws, and the employment statutes of New York State, New York, and the federal government. Well, number one, Judge Hurley assumed, I believe properly, that the solicitation of employment is protected activity. I don't think there's any serious question about that. You're now asking if, as a result of soliciting of employment, workers then violate further laws, does the speech, the solicitation of employment, lose its protection? We think not. Judge Hurley said not. We believe there is ample law saying- And why did the prior panel of this court remand for findings on that? Well, the prior panel asked if it was a facial challenge. And counsel said, well, it's not a facial challenge because they allege all these activities going on in the streets. As it turns out, Judge Hurley hears all these facts and there were depositions and submissions of reports to a fare-thee-well over the next three or four years after the remand. Judge Hurley ultimately says this is a blatantly unconstitutional ordinance under standards of narrowly tailored, not an ordinance concerned with its purported interest of promoting traffic safety. It's an ordinance that has, in fact, nothing to do with traffic safety because it prohibits solicitation of employment under all circumstances, whether traffic is interfered with or traffic is not interfered with. Contrary-wise, if you're soliciting any- Isn't the solicitation of employment from a pedestrian to someone in a passing vehicle? That's correct. How could that not have- I mean, unless people jump on a passing truck without stopping, how could that not have bearing upon the traffic? Well, there are streets, for example, that have no traffic. Number one, there are streets that have parking lots so that in those circumstances, there's no interference whatsoever. Beyond that, if your concern is real- and by the way, Chief McCaffrey, the head of the Department of Public Safety, when asked at deposition, can there be solicitation of employment that doesn't interfere with traffic? He said, flat out, of course. Let me ask you- Self-evident. Why is Centro an organization? Centro's an- What characteristics of an organization does it have? Well, it's an organization formed- it's an unincorporated association under New York law, which is permitted under New York law. It's not incorporated. Workplace project is incorporated, and it's formed for the purpose of advancing the interests of day laborers. There's nothing strange about that. Organizations get formed for political purposes to promote anti-war activities. This Court has handled many of those cases. The day labor ordinances around the country that have been challenged have largely been challenged by organizations. And there'd be another association. You've said, in answer to Judge Parker's question, that you can have an organization that's unincorporated, which surely is the case, but can you have an organization that doesn't have any members except the person who formed it? Well, in fact, she says it's an organization that does have membership. Members are people who come to meetings. At those meetings, they agree on common strategies and tactics about how to promote the interests of the day laborers. I mean, all sorts of- But why not just a meeting as opposed to an organization? I'm sorry, I didn't hear. I mean, under that test, under your response, I mean, any meeting is ipso facto an organization. Well, not necessarily, not unless you have formed an organization in advance of a meeting. When I have a meeting at my house, unless I call an organization, I don't call a group of us meeting an organization. They call themselves an organization. She created, Ms. Torres created, with a group of day laborers- What I can't quite understand is what did she create? She created an organization, unincorporated association, that had as its purpose advancing and promoting the interests of day laborers. No members, no meeting schedule, no- They do have meetings, and there's every reason to believe they're scheduled. There's nothing in the record that says they're not scheduled, but they don't maintain other kinds of membership lists. That is the central criterion for belonging to the organization. Can you cite any case from our court that has given organizational standing to an entity that you've just described for us? I go a long ways back, Your Honor, and I have in mind the Fifth Avenue Peace Parade Committee a long time ago. My recollection of that organization is that it met to oppose the then war in Vietnam, a group of people. Nobody asked about membership, but people came to meetings, and they turned out parades, very effective parades. Was there a challenge? Centro has done- Was there a challenge? May or may not. I have no idea, but I understand that it may be a challenge here. I'm not sure what the legal significance of that is. You said it's an organization because though it is unincorporated, it has a certain purpose. Now, if you had any individual in this room who had a purpose to reduce cruelty to animals, why wouldn't that person have organizational standing to challenge, for example, the hunting laws? Well, I don't know how many people it's necessary to have in an organization to have- Is one enough? I don't know any law on that. It implies- You only have one. What's there to organize? Well, Centro clearly isn't- Organize yourself, I assume. I understand, and the undisputed testimony here is that Centro has numbers of people who come to meetings, who then go out on the sidewalks and attempt to counsel day laborers. There's nothing- Are you objecting to any discovery as to who those members might be? As to their names, yes. Excuse me, and you don't represent any of them. You don't represent any of these laborers. Is that correct? There are no individual day laborers who are plaintiffs in this lawsuit. Your clients are the two organizations. That's exactly right. None of the individual day laborers. That's exactly right. However, their interests are at stake here under well-settled standing principles. Even if there were some serious question, and I don't believe there is, of Centro's standing to bring this suit, they have very clear standing. They've been injured. They're deterred from counseling on the streets. Their central mission- Who's they? The pronoun they. They stay- Is plural. That's correct. Okay. Now, Ms. Torres is singular. So, who's they? They are day laborers who come to meetings, and therefore, she assumes- We're just talking about people who go to advocate. Day laborers are too busy working during the day, I presume, to be busy advocating on behalf of this organization. So, who's the they who are organizing through or with or through or by this organization? Well, the sad reality is that day laborers who go out at six in the morning often don't get jobs. I understand. So, they do stand on street corners advocating for the rights of day laborers and to promote the ability of day laborers to solicit employment. Where's that in the record? I don't have a page in front of me, but Luz- Who told this to you? No, Luz Torres. The major testimony about Centro here is- are affidavits of Luz Torres, plus she was deposed extensively, and Judge Rustini addressed a particular issue of whether or not the ordinance had affected or injured the Centro, and she said no because it's been enjoined, and yes, there was a period of time that they didn't enforce it, but they did say that very publicly and put out leaflets to that effect. Saying what? They were not- this is to- Saying that they were not enforcing it? Yes, this is to advise you that- Well, they were not enforcing it during a period of time, and everyone knew they were not enforcing it, and then the question is what does Ms. Torres say or any member of this organization say about what they were inhibited from doing or what they were unable to do or how it affects their plans in the future if this statute is not enjoined? She- she testifies that on the basis of the terms of the ordinance, she has a reasonable fear that those who are counseling on the sidewalks will be viewed as people who are soliciting employment because a solicitation of employment is defined as people who are merely standing on the sidewalk facing traffic. So she says we worry that people will be picked up under this ordinance. That's number one. Number two, there's another injury that Centro has experienced and workplace as well, namely the ability to recruit- to recruit day laborers and thus advance the organizational mission, which is- which this court- Recruit them as what? As- as members of these organizations. If they're not- if they're not on street corners because they fear being prosecuted under this ordinance, then they're not going to join forces with these organizations and advance their cause. And it's- Thank you very much, sir. We'll hear- I just want to make two very, very brief points. And the first, I think, is the most important. Counsel has said, and the plaintiffs have said throughout this case, that solicitation of employment is protected speech, as if that's a given, as if that's a universal. Well, of course, we don't know because- Begging in the subway on the Second Circuit precedent is protected speech. Why wouldn't seeking a job? Because it depends on the content of the speech. I don't think it actually does, but let me get right to that. If the speech is, I'll hire you, Mr. Day Laborer, and it's a good thing for you because I'm going to pay you cash, you don't have to pay taxes. If that's the speech- You know, you're not the RRS. We can't assume- we are not permitted to assume that these individuals are going to violate laws that have nothing to do with you. Well- You're not- Your Honor- It's not our role, and I'm not clear it's your role. I know you are anxious to embrace it, but I'm not sure that's the way the system works. I'm not anxious to embrace it, Your Honor. I'm anxious to embrace my defense against the claim by arguing, I think correctly, that they can't satisfy the first element of the central Hudson test, and that's what this court told me to go back and make a record. I would like to read you one line. This is what Judge Hurley said in an earlier case affirmed by this court. It's in our brief, our reply brief at page 22. It's the United States of the Imanelli case, and he says, this is quoting Judge Hurley, it is common knowledge that paying an employee off the book denotes, in other words communicates, the absence of any reporting by the employer of such payments to the IRS, a failure by the employer to withhold for federal income taxes and social security, and the non-issuance of Form W-2s to employees. So what my- Employees, of course. We can't presume that these people are all criminals, but you do. I don't, Your Honor. I was very- No, I apologize for interrupting, Your Honor. I was very anxious, as Your Honor in particular, because you raised it, I remember respectfully, directed us to go back and make a record. And I would have deposed these day laborers, and I submit that like the five employers we were ultimately, after another protective order, permitted, not a single one of them provided tax reporting. Not a single one recorded the amount paid. Not a single one verified. So the only test we have is the five employers we were permitted, I suggest to the court, had we been permitted to depose the day laborers. But I'm making the final point, is more than that, what I'm saying is implicit in the speech that we're talking about, as Judge Hurley himself said, implicit in it is that this is off the cash employment, and it implies in and of itself all of those- Why isn't that commercial speech? It is commercial speech. And it implies- It implies, as Judge Hurley said- It implies to anybody who solicits employment, right? Whether ultimately all laws will be obeyed or not, correct? It implies in the context of this shape-up site that we've described, and offered that its whole raison d'etre is the off-the-books illegal employment of people who are not entitled to be employed and who are not going to- And they're employers. We're not putting all the blame on the day- The market is a market for illegal employment. I'm not sure I understand how we can come to a conclusion like that. I mean, obviously, if somebody- If I offered to perform dentistry services, that would be an illegal contract because I'm not a dentist, I'm not licensed, and I'd make a mess of it. But that would be offering an illegal contract. But there's nothing wrong with working, usually in construction, and that's not an illegal contract. You're just- You're assuming that the circumstances as such is to bespeak a cash transaction and that that bespeaks the avoidance of taxes and regulation. I would have preferred to be able to establish it by testimony, but I was prevented. But what I'm saying is that's exactly what Judge Hurley says in that quotation I cited from the case this Court affirmed, that that is, in fact, implied. Yes, Your Honor. Before you sit down, let me just ask you one last question. This ordinance reaches the person standing on the median strip. Let's say he is on the median strip in the not densely populated area of Oyster Bay, and he's holding a sign, I'm a veteran, I will work for food. He's violated the ordinance. No, Your Honor, not necessarily. And by the way, of course, that's not the real world facts. But as Judge Lynch made incredibly clear the last time we were here, and of course, I know we've cited it extensively, but because it's so true, what he said, and I'm reading it right now, the conduct is stopping motor vehicles or attempting to stop motor vehicles. If you don't stop a motor vehicle or try to stop a motor vehicle, there's no violation. And just to build on that, we haven't talked about Redondo Beach, but in Redondo Beach, for example, the ordinance specifically prohibits solicitation. That's what it says. You can't solicit. It is not the case. I wrote it. I deliberately didn't say it. I wrote it as narrowly as humanly possible. It says you can't stop or attempt to stop a vehicle for that purpose, as Judge Lynch pointed out. So unless he's out there in the margin, you know, and interfering with traffic in some way, he could not be ticketed. Well, couldn't you be ticketed if you were standing on the sidewalk facing traffic under circumstances or any group of other people who were soliciting work? You could be solicited if you do it in such a way that the peace officer, we don't have police, of course, views it as an attempt to actually stop a moving vehicle. What's really happening out there is they're swarming cars stopped on side streets and preventing them from moving. They're swarming double parked cars. They're swarming the driver's window into the driving lanes. There's plenty of stopping and attempting to stop, which is flagrant and obvious. This is irrelevant, but wouldn't it be really easy to set up some place where this kind of transaction can go on and avoid the danger to the slowing of traffic and the danger to pedestrians? You know, yes, Judge, but two buts. First of all, yes, we could do that. We're under no legal obligation to do it. I'm not saying you are. There is, but there is one less than two miles next door in Glen Cove. There is exactly that. Yes, they do. Less than two miles away. The testimony is that people come from Glen Cove to our site. They could take a taxi. They could ride their bikes or walk. In fact, what they do, and this is in the record, it's in Ms. Torrey's testimony, they actually come from Glen Cove to this site. They go right by such an existing site. Why? Actually, it's not in the record, so I'm not going to say, but there are reasons why they choose not to go to that site. As a matter of fact, people come to us, to our Shape Up site, to use the vernacular, and don't go to that site, which has existed for years. There seems to be a great demand in Oyster Bay for these laborers. I think there's a demand everywhere for these laborers, Your Honor. But you didn't make it a crime to hire these folks. We couldn't make that a crime. We are a town. We don't even have police. We can't enforce the motor vehicle and traffic laws, for example. We have a very narrow purview. People who enforce the laws you have on the books. I'm sorry, Judge? There are laws on the books, and you say you can't enforce them. The question is, isn't that a different problem? Your relationship with the NTD that can enforce them. Well, the federal government could enforce certain laws, the state government, and we can't. Who gets our traffic tickets? County police. Nassau County Police. And we went, and it's in the record, we went to the county and said, please increase your, see, the reality is this. First of all, we're not talking about one individual holding up a sign. We're talking 30 people, 40, 50 a day, every day, in the same two block area, crowding the street, crowding the sidewalk, blocking the streets. Who gets the phone call? The person who gets the phone call is the supervisor of the town of Oyster Bay. We did the best we can within what we have, and we believe we did it narrowly and constitutionally. There are no more questions. I will thank you both. Thank you both. We gave you a hard time. We will reserve decision. The final case on calendar is Lawrence v. Evans. We are taking that on submission. That's the last case on calendar. Please adjourn court. Thank you. Court is adjourned.